IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

EVAN WARD,           )
      Plaintiff,        )
                    )
      v.              )      CIVIL NO. 3:12-cv-199-REP
                    )
MICHAEL J. ASTRUE,    )
      Commissioner of Social Security,  )
      Defendant.      )
                    )

## REPORT AND RECOMMENDATION

Evan Ward ("Plaintiff") is 56 years old and worked at Philip Morris on the maintenance cleanup crew for the HVAC system for over 15 years. Plaintiff alleges that he suffers from anxiety, pancreatitis and a heart murmur. On July 15, 2005, Plaintiff applied for Disability Insurance Benefits ("DIB") with a disability onset date of October 14, 2004 — later amended to October 27, 2004 — under the Social Security Act (the "Act"). Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits initially and upon remand from the Appeals Council. On January 13, 2012, the Appeals Council denied Plaintiff's request for review. The parties appeared before this Court for oral argument on this matter on September 26, 2012.

Plaintiff asserts that the ALJ erred when he assigned weight to the opinions of the treating and examining doctors. (Pl.'s Mem. in Supp. for Mot. for S.J. (Pl.'s Mem.) at 10-20.) Similarly, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility. (Pl.'s Mem. at 20-30.) In his decision, the ALJ assessed that Plaintiff was not fully credible. (R. at

47.) He also assigned appropriate weight to the non-treating state agency psychologist and very limited, little or no weight to the opinions of the treating and examining doctors. (R. at 47-48.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions, the entire record in this case and heard oral argument in this matter, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff's appeal focuses on his mental health, Plaintiff's physical health is not discussed in great detail. Instead, Plaintiff's education and work history, Plaintiff's medical history, the opinions of psychologists and psychiatrists, the opinions of a non-treating psychologist and Plaintiff's statements are summarized below.

### A.     Plaintiff's Education and Work History

Plaintiff completed high school. (R. at 482.) Plaintiff previously worked at Philip Morris from 1975 through 2004 on the maintenance cleanup crew for the HVAC system. (R. at 78, 635, 1768.) Plaintiff indicated that he stopped working in October 2004, because he could no longer

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

perform the job. (R. at 78.) However, medical records indicated that Plaintiff was fired due to excessive absenteeism as a result of his alcohol abuse. (*See* R. at 684, 712.) As early as October 2003, Plaintiff admitted to having problems at work and the possibility of being fired. (R. at 657.)

**B.    Plaintiff's Medical History**

Plaintiff was hospitalized from January 7, 2004, through January 10, 2004, for stomach pain. (R. at 201.) Plaintiff was characterized as a former, heavy alcohol abuser with a history of drinking one pint of alcohol a day. (R. at 201.) Plaintiff denied a history of depression and indicated that he had stopped taking Paxil. (R. at 204.) At discharge, Plaintiff was diagnosed with acute chronic pancreatitis, a history of alcohol abuse in remission since October 2003 and depression. (R. at 201.)

On September 2, 2004, Plaintiff was admitted to the psychiatric wing of John Randolph Medical Center for his acute drinking. (R. at 252-53.) Plaintiff indicated that he had been sober for four years, but had been feeling depressed and suicidal. (R. at 252.) He had been drinking a significant amount of alcohol. (R. at 253.) At discharge four days later, Plaintiff was diagnosed with major depression (recurrent severe) and alcohol dependence. (R. at 251.) He insisted that he wanted to quit drinking, but had a hard time staying sober and worried that obtaining help would interfere with his work schedule. (R. at 251.) He was assigned a Global Assessment of Functioning ("GAF")[2] of 20[3] at admission and a GAF of 55[4] at discharge. (R. at 251.)

---

[2] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter "*DSM-IV*").

[3] A GAF of 11-20 is defined as "[s]ome danger of hurting self or others (*e.g.,* suicide attempts without clear expectation of death; frequently violent; manic excitement) OR

3

On September 13, 2004, four days after being discharged from the hospital, Plaintiff returned for another four-day psychiatric admission due to drinking. (R. at 304.) His GAF was rated at 40.[5] Plaintiff admitted to drinking a fifth of vodka a day for 20 out of the last 30 days. (R. at 304.) He indicated that he was last sober between January and March 2004. (R. at 304.) At admission, Plaintiff's blood alcohol level was 0.368. (R. at 304.)

Plaintiff stated that he was attempting to quit drinking on his own, but would drink to self-medicate withdrawal symptoms. (R. at 304.) He had suicidal ideations. (R. at 304.) Plaintiff was recommended to attend residential treatment, but declined and instead stated he would attend Alcoholics Anonymous ("AA") meetings. (R. at 305.) Plaintiff was diagnosed with acute alcohol intoxication, alcohol dependence, possible alcohol induced hypertension and severe work stressors due to his abstinence from alcohol. (R. at 304-05.)

Over the next six months, Plaintiff continued to be admitted to the hospital for his alcohol abuse. (*See* R. at 308, 346, 443, 482, 580.) For example, on January 13, 2005, Plaintiff felt depressed and had abdominal pain, so he drove to the store to buy alcohol and numb his pain. (R. at 445.) While in the parking lot, Plaintiff had several alcoholic drinks, drove and then was found by the police in a ditch. (R. at 445.) The police brought him to the hospital for admission. (R. at 445.) Plaintiff had no recollection of driving into the ditch. (R. at 445.)

---

occasionally fails to maintain minimal personal hygiene . . . OR gross impairment in communication (*e.g.,* largely incoherent or mute)." *DSM-IV* at 34.

[4] A GAF of 51-60 is defined as "[m]oderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

[5] A GAF of 31-40 is defined as "[s]ome impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* at 34.

During that hospital stay, Plaintiff appeared depressed with a constricted affect. (R. at 448.) He denied delusions, hallucinations and suicidal or homicidal ideations. (R. at 448.) Plaintiff was diagnosed with alcohol dependence, major depression disorder without psychotic features, alcohol induced hallucinations, hypertension, pancreatitis and withdrawal seizures. (R. at 449.) His GAF was assessed at 30[6] to 40. (R. at 449.) Plaintiff did not want to obtain any treatment for his alcoholism, but was willing to try an antidepressant. (R. at 449.)

In a discharge summary dated January 28, 2005, Plaintiff was diagnosed with severe alcohol dependence, recurrent major depression and pancreatitis with severe psychosocial stressors. (R. at 483-84.) His GAF was assessed at 20 at admission and 50 at discharge. (R. at 484.) At admission, Plaintiff tested positive for alcohol, marijuana and benzodiazepine. (R. at 482-83.) He was admitted for his heavy drinking and claimed he had been on disability for four months. (R. at 482.) Plaintiff reported that he was sexually abused as a child. (R. at 482.) He was observed with a sad and depressed affect and did not make eye contact. (R. at 483.) He discussed his anger, history of substance abuse and effects of alcohol on his body and family. (R. at 483.)

In April 2005, Plaintiff's drinking pattern was characterized as binge drinking. (R. at 580-81.) On June 14, 2005, Plaintiff was admitted to the hospital for overdosing on Ativan. (R. at 635.) Plaintiff stated that he had abstained from alcohol for a few months, but started thinking about taking a drink and instead took multiple doses of Ativan. (R. at 635.) When he was admitted, Plaintiff was intoxicated and hallucinating after having taken 34 Ativan in two days. (R. at 635.) Plaintiff was disheveled, but cooperative with a broad affect and without an anxious

---

[6] A GAF of 21-30 is defined as "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.,* stays in bed all day; no job, home, or friends)." *DSM-IV* at 34.

mood. (R. at 635.) He stated that he had intractable anxiety, which led him to drink when his anxiety was not under control. (R. at 636.) Plaintiff indicated that he was "over the detox," and was discharged and diagnosed with generalized anxiety disorder, alcohol dependence, recent overdose of benzodiazepine drugs, chronic pancreatitis, hypertension, circadian rhythm disturbance and nicotine dependence. (R. at 636.)

Medical records from August 3, 2005, noted diagnoses of recurrent major depression, alcohol dependence, hypertension and pancreatitis. (R. at 683.) Plaintiff's GAF was rated at 35. (R. at 683.) A family member reported that Plaintiff abused painkillers and threatened suicide. (R. at 684.) Plaintiff had a blood alcohol level of 0.246 and requested detoxification. (R. at 684, 686.)

A few weeks later, Plaintiff's blood alcohol level on admission was 0.328. (R. at 689.) Plaintiff was diagnosed with alcohol abuse with withdrawal syndrome, depressive disorder and assigned a GAF of 30. (R. at 1145.) Despite his diagnosis of depressive disorder, there was no "evidence of major clinical depression." (R. at 1145.)

In September 2005, Plaintiff was admitted overnight to the hospital for abdominal pain and vomiting. (R. at 818.) Plaintiff drank two or three fifths of vodka and liquor over five days. (R. at 818.) He was unhappy, alert and oriented. (R. at 818.) Plaintiff requested a sleeping pill for his insomnia. (R. at 818.) He was diagnosed with alcohol dependence, substance induced mood disorder with depressive features, chronic pancreatitis secondary to alcohol, hypertension and chronic pain. (R. at 818.) Plaintiff's prognosis was unfavorable. (R. at 819.)

On October 17, 2005, Plaintiff visited the hospital, complaining of pancreatitis as a result of a three-day alcohol binge the previous week. (R. at 906.) Plaintiff was anxious, as well as depressed, and avoided eye contact. (R. at 907.) He was prescribed Vicodin. (R. at 907.)

In April 2006, Plaintiff was admitted to the hospital for four days, because he drank large amounts of vodka over two days, was intoxicated and had abdominal pain. (R. at 843.) Plaintiff was unhappy, alert and oriented, and complained of abdominal pain and insomnia. (R. at 843.) He requested benzodiazepine drugs, but was denied them. (R. at 847.) He underwent a detoxification program. (R. at 843.) Plaintiff's prognosis was guarded. (R. at 844.)

In July 2006, Plaintiff visited the hospital for his pancreatic pain. (R. at 892.) He was assessed to have anxiety with depression, but with normal psychomotor function, speech pattern, thought and perception. (R. at 892-93.)

On October 3, 2006, Plaintiff was admitted to the hospital for five days with abdominal pain, nausea, vomiting and increased alcohol intake. (R. at 868.) He indicated that he began drinking again due to stress and drank 10 to 16 ounces of white liquor daily. (R. at 870-71.) Plaintiff was diagnosed with chronic pancreatitis, alcohol abuse with a history of alcohol withdrawal, hypertension and possible substance abuse and medication seeking tendencies. (R. at 868.)

In December 2006, Plaintiff was hospitalized for four days for chronic pancreatitis, alcohol abuse and depression. (R. at 954.) At discharge, Plaintiff was instructed to attend AA meetings and stop drinking. (R. at 954.) He was prescribed methadone for pain management. (R. at 954.)

In January 2007, Plaintiff was hospitalized for being drunk and suicidal. (R. at 987.) Plaintiff reported that he would pass out and wake up frequently, could perform activities of daily living ("ADLs") himself, could not keep any jobs and had poor social skills when drinking. (R. at 988.) Plaintiff was suspicious, belligerent, casual, agitated, loud, slurring his words, angry, confused, distracted, paranoid and disoriented. (R. at 989.) He had a history of alcohol

abuse and abusing narcotic pain medications. (R. at 989.) Plaintiff was diagnosed with depression, alcohol dependency and opiate dependency with a GAF of 40. (R. at 994.)

Plaintiff visited the hospital on January 23, 2008, complaining of pain associated with his chronic pancreatitis. (R. at 1548.) He reported feelings of hopelessness and stated that his pain was so constant that it was causing him to be depressed and anxious. (R. at 1548.) Plaintiff received a prescription for methadone. (R. at 1548-49.)

On March 24, 2009, Plaintiff visited the hospital, complaining of depression, anxiety, financial stressors, chronic pain and feelings of agitation. (R. at 1507.) Plaintiff's medications included Xanax and methadone. (R. at 1507.) He reported that he had been sober for three years and attended support group meetings on a regular basis. (R. at 1507.)

## C. The Medical Records and Opinion of Graenum R. Schiff, M.D., Plaintiff's Treating Psychiatrist from 2005 through 2007

Plaintiff visited Graenum R. Schiff, M.D., on June 28, 2005. (R. at 767.) At that time, both Plaintiff and his wife stated that he was not drinking. (R. at 767.) Plaintiff's wife complained that he was experiencing anxiety with ups and downs and mood swings. (R. at 767.) Plaintiff was alert, oriented, coherent and goal directed. (R. at 767.) Dr. Schiff diagnosed Plaintiff with generalized anxiety disorder and alcohol dependency. (R. at 767.)

On July 12, 2005, Plaintiff visited Dr. Schiff, who marked that Plaintiff's appearance, attitude and energy were normal and appropriate. (R. at 766.) However, Plaintiff had issues sleeping and was anxious. (R. at 766.) Plaintiff was alert, oriented, abstaining from alcohol and "up and down." (R. at 766.)

Plaintiff was diagnosed with alcohol dependency by Dr. Schiff on September 1, 2005. (R. at 765.) The doctor also marked that Plaintiff's appearance, attitude, mood, sleep,

concentration, appetite and energy were all appropriate and within normal limits. (R. at 765.) Plaintiff was anxious, but coherent and goal directed. (R. at 765.)

On September 8 and September 27, 2005, Dr. Schiff noted that Plaintiff was in chronic pain. (R. at 763-64.) He also marked on September 8 that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits and that Plaintiff was alert, oriented, coherent and goal directed. (R. at 764.)

Plaintiff visited Dr. Schiff on November 7, 2005, who marked that Plaintiff appeared depressed, agitated, irritable and anxious. (R. at 762.) He also marked that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits and that Plaintiff was alert, oriented, coherent and goal directed. (R. at 762.)

On November 15, 2005, Dr. Schiff marked that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits. (R. at 761.) He also marked that Plaintiff was alert, oriented, coherent and goal directed. (R. at 761.)

On November 16, 2005, Dr. Schiff completed a Mental Residual Functional Capacity ("RFC") Assessment. (R. at 755-58.) He marked that Plaintiff's limitations were moderate or moderately severe in all areas, that Plaintiff had three episodes of decompensation and that Plaintiff would become stressed from attendance requirements and the need to make quick, accurate decisions. (R. at 755-57.) In Dr. Schiff's opinion, Plaintiff was credible and disabled as of October 1, 2004. (R. at 756-57.) Dr. Schiff diagnosed Plaintiff with depression, pancreatitis and alcohol dependence with a GAF of 54. (R. at 758.) He marked that Plaintiff's symptoms included sleep disturbance, personality change, mood disturbance, substance abuse, loss of

interests, psychomotor agitation, feelings of guilt or worthlessness, difficulty thinking, social withdrawal, decreased energy and generalized persistent anxiety. (R. at 758.)

Plaintiff told Dr. Schiff on December 7, 2005, that he had panic attacks and paranoia. (R. at 760.) Dr. Schiff marked that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits. (R. at 760.) He also marked that Plaintiff was alert, oriented, coherent and goal directed. (R. at 760.)

On December 22, 2005, Dr. Schiff marked that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits. (R. at 759.) He also marked that Plaintiff was alert, oriented, coherent and goal directed. (R. at 759.) Plaintiff stated that he went to church. (R. at 759.)

Two months later, Plaintiff visited Dr. Schiff, who marked that Plaintiff was alert and oriented. (R. at 976.) On March 31, 2006, Plaintiff's appearance, attitude, sleep, concentration, appetite and energy were all appropriate and within normal limits. (R. at 975.) Plaintiff was alert, oriented, coherent and goal directed. (R. at 975.) He was worried about his upcoming surgery and reported being anxious, shaking and sweating. (R. at 975.) Plaintiff requested benzodiazepine drugs. (R. at 975.)

Two weeks later, Plaintiff reported that he was attending AA meetings. (R. at 974.) Dr. Schiff marked that Plaintiff was alert and oriented and his appearance, attitude, mood, sleep, concentration, appetite and energy were all appropriate and within normal limits. (R. at 974.) In May 2006, Plaintiff was in pain and worried about money. (R. at 973.) Plaintiff's appearance, attitude and appetite were within normal limits and Plaintiff was alert, oriented, coherent, goal directed, depressed and anxious. (R. at 973.)

In June 2006, Plaintiff complained that his insurance coverage ran out and he had no pharmaceutical coverage. (R. at 971.) Two months later, Plaintiff was diagnosed with severe alcohol and depression. (R. at 970.) Dr. Schiff marked that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all within normal limits. (R. at 970.)

On December 21, 2006, Dr. Schiff documented two recent relapses with vodka. (R. at 969.) He diagnosed Plaintiff with alcohol dependency and depression and marked that Plaintiff's symptoms were worsening. (R. at 969.) However, he continued to mark that Plaintiff's appearance, attitude, mood, sleep, concentration, appetite and energy were all within normal limits and that Plaintiff was alert and oriented. (R. at 969.)

Plaintiff was diagnosed with alcohol dependency on March 23, 2007. (R. at 1182.) Plaintiff stated that he would get depressed when he thought about his money problems. (R. at 1182.) He was alert, oriented, coherent and goal directed with his appearance, attitude, mood, sleep, concentration, appetite and energy within normal limits. (R. at 1182.)

**D.      The Patient Notes of Jozef Bledowski, M.D., Plaintiff's Treating Psychiatrist from 2009 to 2010.**

Plaintiff was referred to Jozef Bledowski, M.D., for psychiatric care. (R. at 1624.) Plaintiff first visited Dr. Bledowski on April 23, 2009. (R. at 1623.) He stated that he wanted his life to become "settled" and to regain faith and hope. (R. at 1623.) Plaintiff admitted to a life-long battle with alcoholism and indicated that he attended AA meetings daily and had friends and family to support him. (R. at 1623.) Plaintiff was stressed over his application for disability, which he indicated was for "alcoholism and panic attacks." (R. at 1623.)

Dr. Bledowski observed that Plaintiff was appropriately groomed with a depressive/anxious thought content, euthymic mood and appropriate affect. (R. at 1623.) He

diagnosed Plaintiff with depression, alcohol dependence (in remission), a history of panic attacks, dependent personality traits, chronic pancreatitis and hypertension. (R. at 1623.)

A month later, Plaintiff reported that he was more depressed and withdrawn, because he was fearful that he would not be approved for disability. (R. at 1622.) Plaintiff worried about his ailing mother and worried that he would be required to care for her, instead of moving on with his life. (R. at 1622.) He felt abandoned by and was resentful towards his ex-wife for leaving him. (R. at 1622.) Dr. Bledowski noted that Plaintiff was more withdrawn with a worse mood. (R. at 1622.) He assessed Plaintiff's GAF at 55. (R. at 1622.)

On June 8, 2009, Plaintiff was anxious, because he was deciding whether he should move in with two people from his AA group. (R. at 1621.) He was still anxious about his pending disability claim and continued to have episodes of overwhelming fear. (R. at 1621.) He did, however, feel hopeful for the future and had an improved mood. (R. at 1621.) Dr. Bledowski rated Plaintiff's GAF at 65.[7] (R. at 1621.)

A few weeks later, Plaintiff continued to be anxious over his disability claim and finances. (R. at 1620.) He expressed fear of what would happen if his mother passed away. (R. at 1620.) Plaintiff reported frequent anxiety attacks and had sporadic eye contact with a dysphoric mood. (R. at 1620.) Dr. Bledowksi assigned Plaintiff a GAF of 55. (R. at 1620.)

On July 10, 2009, Plaintiff reported that he was more depressed with increased anxiety over his disability appeal. (R. at 1619.) He considered discontinuing his AA meetings, as he felt he did not gain anything from them. (R. at 1619.) Dr. Bledowski noted that Plaintiff did not have any perpetual abnormalities and rated his GAF at 55. (R. at 1619.)

---

[7] A GAF of 61-70 is defined as "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

A week later, Dr. Bledowski's notes indicated that the "theme of [the] session remain[ed] self-pity, assertions in self-worth [and] difficulty accepting uncertainty about [the] future." (R. at 1618.) Plaintiff continued to be fixated on his disability claim related to his alcoholism. (R. at 1618.) He indicated that he benefited from talking with someone about his problems. (R. at 1618.) Plaintiff had good eye contact and a GAF of 60. (R. at 1618.)

On July 31, 2009, Plaintiff reported that his craving for alcohol had increased and he had been missing some AA meetings. (R. at 1617.) Plaintiff indicated worsening feelings of despair after learning that his memory was deteriorating. (R. at 1617.) He continued to be fixated over his disability claim and had a GAF of 60. (R. at 1617.)

In early August 2009, Plaintiff admitted to having recent thoughts of self-harm and continued to focus on his disability appeal. (R. at 1616.) Dr. Bledowski noted that Plaintiff had poor eye contact and a GAF rated between 55 and 60. (R. at 1616.) A week later the session was similar, in that Plaintiff's outlook and GAF had not changed. (R. at 1615.)

On September 3, 2009, Plaintiff's mood was good and Plaintiff was optimistic. (R. at 1614.) Plaintiff reported that he was having a good day and started looking on the bright side of life; he continued to attend his AA meetings. (R. at 1614.) Plaintiff's GAF was assessed at 60-65. (R. at 1614.)

Plaintiff maintained good eye contact on September 18, 2009, although he continued to be stressed by his pending disability appeal. (R. at 1612.) Dr. Bledowski assigned Plaintiff a GAF between 55 and 60 and prescribed Xanax. (R. at 1612.) A week later, Plaintiff canceled his therapy session, because his mother was ill. (R. at 1609, 1611.) Plaintiff told Dr. Bledowski that he was not sure whether he wanted to continue with therapy. (R. at 1609.)

On November 11, 2009, Plaintiff had a depressed mood and blunted affect. (R. at 1607.) He continued to discuss his pending disability appeal and stated that he could not find any financial alternatives, rejecting the idea of part-time work. (R. at 1607.) Plaintiff denied alcohol use and attended AA meetings. (R. at 1607-08.) He expressed suicidal ideations, recanting them after explaining that he must care for his sick mother. (R. at 1607.) Dr. Bledowski rated Plaintiff's GAF at a 55-60. (R. at 1607.)

A week later, Dr. Bledowski assigned Plaintiff a GAF of 60-65 and observed Plaintiff's good eye contact, optimism, better mood and brighter affect. (R. at 1606.) Plaintiff was attending AA meetings on a daily basis, which helped him "spiritually." (R. at 1606.) He also discussed caring for his mother, who had early stages of Alzheimer's disease, and exhibited caretaker's burden. (R. at 1606.) On November 11, 2009, Plaintiff canceled his appointment with Dr. Bledowski, because he was feeling "bad" from a flare-up with his pancreatitis, had taken methadone and could not drive. (R. at 1605.) Plaintiff also reported that his mother was recently hospitalized. (R. at 1605.)

Plaintiff had a better mood and was less depressed on December 4, 2009. (R. at 1604.) Plaintiff discussed caring for his mother with Dr. Bledowski and expressed satisfaction that he had found a sense of purpose in life. (R. at 1604.) Dr. Bledowski rated Plaintiff's GAF at 65. (R. at 1604.)

A week later, Plaintiff reported that his anxiety level had decreased, but his mood and depression had worsened. (R. at 1602-03.) He exhibited signs of caretaker's burden, as his mood had been affected by his mother yelling at him. (R. at 1602.) Plaintiff was assigned a GAF of 60-65. (R. at 1602.)

Plaintiff had a bad mood and was more irritable on December 16, 2009. (R. at 1601.) Caring for his mother resulted in feelings of guilt and despair. (R. at 1601.) Plaintiff continued to attend AA meetings and lean on AA members for support. (R. at 1601.)

On December 28, 2009, Plaintiff continued to discuss the feelings of despair and being overwhelmed that he felt from attending to his mother. (R. at 1600.) He maintained sobriety, attended AA meetings and talked with his sponsor. (R. at 1600.) Dr. Bledowski assessed Plaintiff's GAF to be between 60 and 65. (R. at 1600.)

Plaintiff had a bad mood, blunted affect and overly depressive content on January 15, 2010. (R. at 1597.) He discussed feelings of despair and hopelessness regarding his social situation, including fear of losing his housing, current financial strains and guilt associated with caring for his mother. (R. at 1597.) Plaintiff's GAF was rated at 60. (R. at 1597.) Plaintiff denied suicidal ideations at the session and when he learned that he would have to leave his mother's house. (R. at 1596-97.)

On January 22, 2010, Plaintiff made no eye contact and was minimally interactive. (R. at 1595.) He felt despair over his current social situation, including his impending homelessness. (R. at 1595.) Dr. Bledowski wrote that Plaintiff "still lack[ed] motivation for eliciting change or progress which then translate[d] to an overall lack of motivation during sessions." (R. at 1595.) He assigned Plaintiff a GAF of 55-60. (R. at 1595.) On January 26, 2010, Plaintiff cancelled his appointment, because he was "doing well." (R. at 1593.)

E. **The Report and Opinion of Therese May, Ph.D., Consultative Psychologist**

Plaintiff was referred to Therese May, Ph.D., for an evaluation of his mental status as a result of his filing for disability. (R. at 750.) On October 18, 2005, Plaintiff visited Dr. May and admitted to having consumed 18 beers a day and/or a fifth of liquor, but claimed his last use of

alcohol was in September 2005. (R. at 750.) Medical records documented a long history of alcohol dependence, psychiatric hospitalizations and detoxes. (R. at 750.)

At the examination, Plaintiff was alert and oriented with logical thought processes. (R. at 751.) He stated that he had hallucinations and psychotic symptoms when he was withdrawing from alcohol use, and that he had occasional suicidal ideation. (R. at 751.) Plaintiff had an average short-term memory with an intact long-term memory. (R. at 751.) He described himself as nervous and mildly anxious with moderate anxiety, sudden panic attacks and depression rated at a seven out of 10. (R. at 751.) Plaintiff stated that he helped his wife cook and clean, had few hobbies, did not socialize or attend church, watched television, occasionally attended AA meetings and had been sober for two months. (R. at 752.)

Dr. May opined that Plaintiff could understand and perform simple, repetitive tasks while sober. (R. at 752.) If he could maintain sobriety, he should be able to return to his former employment. (R. at 753.) Plaintiff should be able to interact with supervisors, coworkers and the public. (R. at 752.) However, he would likely decompensate under the stress of competitive work. (R. at 752.) Dr. May diagnosed Plaintiff with alcohol dependence, anxiety disorder, major depression, seizures, pancreatitis, as well as high blood pressure, and assessed his GAF at 55. (R. at 752-53.)

**F.      The Opinion of Michael Fielding, Ph.D., Consultative Psychologist**

On July 16, 2009, Plaintiff visited Michael Fielding, Ph.D., for a consultative examination. (R. at 1729.) Dr. Fielding reviewed and summarized Plaintiff's medical records. (R. at 1729-30.) Plaintiff reported that he had recently gained weight, because he was less stressed and worried after having gotten a divorce. (R. at 1730.) Plaintiff alleged that he was disabled, because he could not concentrate or think. (R. at 1730.)

Plaintiff told Dr. Fielding that he quit his job at Philip Morris and received $170,000 from a profit sharing plan in 2004, but that money had been spent. (R. at 1731.) Plaintiff reported that he stopped drinking in February 2007, after which he became more anxious and depressed. (R. at 1731.) He stated that he had attempted to work, but he was in too much pain to do so. (R. at 1731.) Plaintiff discussed his molestation as a young child, which his mother decided not to report. (R. at 1731.) He denied having used street drugs and attending church. (R. at 1731-32.) Plaintiff admitted that he had no intention of abstaining from alcohol when he was in drug treatment. (R. at 1731.) He stated that he faced charges for drunk in public and DUI. (R. at 1731.)

Dr. Fielding observed that Plaintiff had normal appearance, was cooperative and was not impulsive. (R. at 1732.) His thought process was not logical or organized. (R. at 1733.) Dr. Fielding noted a degree of paranoia based on Plaintiff's desire to stay at home and his reported panic attacks in stores. (R. at 1733.) Plaintiff admitted to having suicidal thoughts recently and sleep disturbances. (R. at 1733.) He had no energy, a flat affect, anxiety and a lack of motivation. (R. at 1733.)

Plaintiff's longest abstention from alcohol was six years. (R. at 1734.) He reported that he was "dealing reasonably well about being" sober since 2007, which contradicted earlier statements in the examination that his depression and anxiety had worsened. (R. at 1734.) Dr. Fielding opined that Plaintiff might have a substance induced mood disorder. (R. at 1734.)

Dr. Fielding found Plaintiff credible. (R. at 1734.) He diagnosed Plaintiff with alcohol dependence, major depressive disorder (recurrent), anxiety disorder (not otherwise specified with some panic symptoms) and mild dementia from his longstanding alcohol dependence. (R. at 1735, 1743.) Dr. Fielding determined that Plaintiff's prognosis was guarded due to his history

with alcohol. (R. at 1743.) Dr. Fielding noted Plaintiff's severe psychosocial stressors, which included his medical history, substance abuse, loss of a job, loss of income and chronic pain. (R. at 1735.) He assessed that Plaintiff had fair adaptive functioning and a GAF of 45. (R. at 1735.) Dr. Fielding also remarked that he was surprised that Plaintiff had abstained from alcohol for two years "given the severity of his condition" and that Plaintiff felt his depression and anxiety were "out of control" now that he was no longer self-medicating. (R. at 1735.)

Dr. Fielding opined that Plaintiff would have difficulty acquiring and using information, completing detailed and complex tasks, performing simple and repetitive tasks over a sustained period of time, maintaining regular attendance in a workplace until he was more stable, completing a normal workday or workweek and accepting and carrying out instructions on a consistent basis. (R. at 1736.) Plaintiff did not have any desire to interact with people. (R. at 1736.) Dr. Fielding opined that, because he could not deal with stress well, he would have a difficult time in a competitive work environment. (R. at 1737.)

**G.     The Report and Opinion of Salmaan A. Khawaja, Psy.D., Ed.S., LCP, Consultative Psychologist**

After his hearing before the ALJ, Plaintiff was referred to and visited Salmaan A. Khawaja, Psy.D., Ed.S., LCP, a consultative psychologist on March 3, 2010. (R. at 1273.) Dr. Khawaja reviewed and summarized Plaintiff's medical records. (R. at 1273-75.) Plaintiff reported that he was divorced because of his emotional distress issues. (R. at 1276.) He also clearly stated that he did not lose his job due to alcohol-related problems, contrary to medical records. (R. at 1276.) Plaintiff's prescriptions included methadone as well as Xanax. (R. at 1276.) Plaintiff was not seeking counseling for his mental health, because he lacked insurance. (R. at 1276.)

Plaintiff reported that he stopped drinking in 2006. (R. at 1276.) He did not cook, clean, fix things, manage his finances or care for his personal hygiene. (R. at 1276.) Plaintiff was alert, pleasant and disheveled, and had minimal eye contact, slowed speech, poor attention, moderate comprehension problems and slow psychomotor. (R. at 1276-77.) Dr. Khawaja questioned whether Plaintiff's "obviously demonstrated lethargy [was] due to methadone." (R. at 1277.)

Plaintiff stated that he heard voices at night and had suicidal ideation without plan or intent. (R. at 1277.) Dr. Khawaja did not find evidence of paranoia or delusions. (R. at 1277.) Plaintiff's insight and judgment were poor. (R. at 1277.)

Dr. Khawaja observed that Plaintiff "minimize[d] the extent to which alcohol ha[d] been a problem in his life." (R. at 1277.) Regardless, Dr. Khawaja determined that Plaintiff was credible with respect to his alcohol abuse problem and depression, as both issues were well documented in the medical records. (R. at 1278.) Dr. Khawaja noted that the medical records did not significantly address anxiety. (R. at 1278.) He diagnosed Plaintiff with major depression, (recurrent, moderate with psychotic features) and a history of alcohol abuse in remission since 2006. (R. at 1278.) Plaintiff was assessed a GAF of 50. (R. at 1278.) Plaintiff's prognosis was poor without mental health counseling. (R. at 1279.)

Dr. Khawaja opined that Plaintiff was not able to manage his finances due to depression, anxiety, lethargy and his psychomotor problems. (R. at 1279.) Plaintiff could not perform complex and detailed tasks on a consistent basis, could not perform simple tasks, could not maintain regular attendance, could not perform work activities on a consistent basis or without special or additional supervision, could not complete a normal workday or workweek without interruptions, could accept instructions from supervisors, could interact with the public and could not deal with the usual stressors encountered in competitive work. (R. at 1279-80.)

**H.     The Report of Christopher Newell, M.D., Consultative Physician**

Plaintiff visited Christopher Newell, M.D., on March 15, 2010, for a consultative examination. (R. at 1281.)  Dr. Newell documented that Plaintiff had suffered from significant depression and reported feelings of sadness, poor sleep and a lack of motivation. (R. at 1282.) Plaintiff was homeless and did not perform yard work, vacuum or mop. (R. at 1282.)  Dr. Newell observed that Plaintiff was quiet, alert and oriented, had a flat affect, dysphoric mood and little eye contact. (R. at 1282.)  He diagnosed Plaintiff with depression, anxiety and a history of alcoholism and chronic pancreatitis. (R. at 1283.)

**I.     The Opinion of the Non-treating State Agency Psychologist**

On October 24, 2005, Steve Saxby, Ph.D., a non-treating state agency psychologist, diagnosed Plaintiff with major depressive disorder, anxiety disorder not otherwise specified and alcohol dependence. (R. at 799-808.)  Dr. Saxby marked that Plaintiff had one or two episodes of decompensation, mild limitations in his ADLs and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 809.)  He marked that Plaintiff was markedly limited in a few categories, but generally only moderately or not limited in activities. (R. at 811-12.)  Further, Dr. Saxby determined that Plaintiff was partially credible. (R. at 813.)  Plaintiff had multiple hospitalizations due to his mental impairments. (R. at 813.) He had the cognitive ability to understand and perform simple repetitive tasks if he continued to maintain sobriety. (R. at 813.)

**J.     Third-Party Statements**

Cathy Jordan, a long-time friend of Plaintiff's, described Plaintiff as "very moody" due to his pain. (R. at 125.)  She noted a big difference in Plaintiff's personality — he no longer laughed, wanted visitors or visited friends and occasionally expressed suicidal ideations.  (R. at

125.) Ms. Jordon indicated that Plaintiff sat at home and did not want to be around anyone. (R. at 125.)

Dorothy Ward, Plaintiff's mother, wrote that Plaintiff became depressed in the early 2000s. (R. at 126.) He became more withdrawn and had panic and anxiety attacks. (R. at 126.) As a result, Plaintiff stopped working in his yard, fishing and riding his motorcycle. (R. at 126.) He missed work and would become physically sick before work. (R. at 126.) Plaintiff's mother indicated that Plaintiff's sickness led him to stop working. (R. at 126.)

On June 2, 2007, Debra Ward, Plaintiff's wife, wrote that Plaintiff could not work due to his depression, which resulted with Plaintiff being fearful of his duties and not wanting to go to work. (R. at 127.) Because Plaintiff's depression isolated him, Plaintiff took medication, lost his appetite and could not interact well with anyone other than close family. (R. at 127.) Mrs. Ward indicated that Plaintiff was not able to function on a normal, day-to-day process, as he could not make decisions, comprehend his surroundings or remember tasks. (R. at 127.) Plaintiff also became paranoid and negative towards life by expressing suicidal ideations. (R. at 127.)

Plaintiff's sister, Peggy Stone, wrote on June 2, 2007, that she noticed a change in Plaintiff in 2004. (R. at 128.) Plaintiff seemed to be in pain and would not interact at family functions. (R. at 128.) He missed many days at work and became more withdrawn. (R. at 128.) Mrs. Stone indicated that Plaintiff would not leave his house, lost weight and looked unkempt. (R. at 128.) Plaintiff was depressed, had panic attacks and was taking multiple medications. (R. at 128.)

K.     **Plaintiff's Statements**

In August 2005, Plaintiff completed a Function Report, in which he indicated that he could not function until later in the morning and suffered from anxiety, insomnia, suicidal

ideations, agitation, restlessness and anger. (R. at 92-99.) Plaintiff took care of his animals and the house. (R. at 93.) He wrote that he could no longer hold down a job, had bad dreams, and did not want to bathe, dress, shave, be in public around people or go to the barber when he was depressed. (R. at 93.) Plaintiff noted that he prepared simple meals, cleaned, laundered, ironed, drove, shopped, read, watched television, talked on the phone, emailed and visited doctors. (R. at 94-96.) He indicated that he had problems with his family and friends, because he would have mood swings and panic attacks. (R. at 97.) Plaintiff marked that, as a result of his depression, he was limited with talking, hearing, remembering, concentrating, completing tasks, understanding, following instructions and getting along with others. (R. at 97.) He wrote that he could not handle stress, could not handle changes in routine and had a fear of being in public and at work. (R. at 98.)

In his Disability Report for Appeal completed on February 9, 2006, Plaintiff indicated that his memory loss, panic and depression were worsening. (R. at 109.) A week later, he marked in a Daily Activities Questionnaire that he could wash dishes, make his bed, launder, sweep, write, play cards, vacuum, cook simple meals, grocery shop, visit restaurants, visit family, check oil in his car and pay bills, in most cases with difficulty or help. (R. at 119-23.)

On June 26, 2007, Plaintiff testified before an ALJ. (R. at 1755-1806.) Plaintiff reported that he stopped driving regularly in 2005. (R. at 1765-66.) He stated that he worked for Philip Morris as part of a cleaning crew for the HVAC system for the previous 15 years, but quit because he would get sick on his way to work thinking about the responsibilities that he had to face. (R. at 1767-68, 1772.) Plaintiff indicated that his depression had gotten worse since 2005 and had prevented him from working. (R. at 1770.) He admitted to panic attacks and suicidal

ideations as well as being a recovering alcoholic. (R. at 1771-72.) Plaintiff was not taking any medication for his depression or anxiety. (R. at 1782-83.)

Plaintiff testified that he did not have a normal sleeping pattern. (R. at 1779.) He stated that he helped with the shopping, cooking and cleaning. (R. at 1779.) Plaintiff read, cared for his cat and attended AA meetings as well as church. (R. at 1780.) He did not need help attending to his personal hygiene. (R. at 1780-81.)

Plaintiff stated that he had been sober since February 2007. (R. at 1785.) He admitted that he would go through periods of sobriety followed by periods of intoxication. (R. at 1786.) Plaintiff indicated that he had problems with his memory and concentration. (R. at 1787, 1791.) He stated he had never gotten a DUI, but had a drunk in public charge. (R. at 1790.)

Plaintiff testified that he would not leave his bed four or five times a month due to depression. (R. at 1799.) He would go days without bathing and would have crying spells a few times every couple of weeks. (R. at 1799-1800.) Plaintiff had no close friends for at least eight years. (R. at 1800.)

On June 21, 2010, Plaintiff again testified at a hearing before an ALJ. (R. at 1808-43.) He stated that he and his wife decided to divorce. (R. at 1813.) Plaintiff was having trouble managing finances and driving due to his medications. (R. at 1814.) He could no longer fulfill his responsibilities with the chores. (R. at 1815-16.) Plaintiff would stop his pain medications if he needed to drive his mother to her doctors' appointments. (R. at 1820.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB on July 15, 2005, claiming disability due to anxiety, pancreatitis and a heart murmur with an alleged onset date of October 14, 2004, which was later amended to October 27, 2004. (R. at 77, 1264, 1766.) The Social Security Administration ("SSA") denied

Plaintiff's claims initially.[8]  (R. at 71.)  Plaintiff testified before an ALJ on June 26, 2007.  (R. at 1755-1807.)  On July 16, 2007, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. at 1191-1203.)  The Appeals Council remanded Plaintiff's claim on December 17, 2009.  (R. at 1213-17.)  On June 21, 2010, Plaintiff testified before an ALJ.  (R. at 1808-43.)  On July 20, 2010, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. at 34-50.)  The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on January 13, 2012, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.  (*See* R. at 10-13.)  On September 26, 2012, the parties appeared before this Court for oral argument on this matter.

### III.  QUESTIONS PRESENTED

Was the Commissioner's evaluation of the opinions of Plaintiff's treating and examining physicians supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

### IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650,

---

[8] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA.  20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[9] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[10] based on an assessment of

---

[9] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[10] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's residual functional capacity ("RFC")[11] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the

---

[11] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since October 27, 2004, the alleged onset date, and was insured through December 31, 2009. (R. at 39.) At step two, the ALJ determined that Plaintiff was severely impaired from substance abuse disorder (alcohol and drugs), chronic alcoholic pancreatitis, seizures and depression. (R. at 39.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 40-41.)

The ALJ then determined that Plaintiff had the RFC to perform light work, except that he could not climb ropes, ladders or scaffolds and could only occasionally balance, kneel, crawl, crouch or stoop. (R. at 42.) Because of Plaintiff's mental impairment, the ALJ also limited Plaintiff to simple, unskilled work with limited contact with the general public. (R. at 42.) The ALJ summarized Plaintiff's ADLs, which included the ability to take care of his personal needs, prepare simple meals, drive, shop, watch television, care for his cat, visit and play cards with family and friends, maintain his car (with assistance) and go to restaurants. (R. at 42.) Plaintiff indicated that he could not complete tasks and had difficulty concentrating, understanding and following instructions, because of his depression. (R. at 42.) He stated that he took medication and underwent psychotherapy for his depression. (R. at 42.)

With regard to the third-person statements, the ALJ noted that friends and family members wrote that Plaintiff was very moody and becoming withdrawn and suffered from pain, depression, anxiety as well as panic attacks. (R. at 42-43.) More specifically, Plaintiff's wife indicated that Plaintiff's depression isolated him from the world and caused him to lose his

28

appetite; it also made him paranoid and unable to interact with anyone outside his family. (R. at 42.)

The ALJ then summarized Plaintiff's testimony at both hearings. Plaintiff stated that he drove to the store occasionally — including two weeks before his second hearing — and that he could not drive as a result of the effects of his medication. (R. at 43.) He indicated that he could not work, because he was depressed, had panic attacks and had suicidal ideations from flashbacks of a rape. (R. at 43.) Plaintiff admitted that he was a recovering alcoholic with seven years of sobriety from 1994 to 2001. (R. at 43.) He started drinking again, his depression worsened and he stated that he quit his job. (R. at 43.) Plaintiff testified that he became sick and shaky when facing responsibilities. (R. at 43.) He took nitroglycerin and Percocet. (R. at 43.) Plaintiff attended AA meetings when he could or at least three times a week. (R. at 43.)

At the first hearing, Plaintiff indicated that he went to church once a month, helped with the cooking, cleaning and shopping and had had memory and concentration problems. (R. at 43.) He also stated that he was so depressed that he could not leave bed four or five days a month, cried a few times a week and had no close friends for eight years. (R. at 43.) At the second hearing, Plaintiff testified that he could not cut grass, perform household chores, file paperwork, perform tasks in a timely manner or leave his apartment for several days. (R. at 43.)

The ALJ highlighted inconsistences in the medical record where Plaintiff reported to the medical staff that he had been sober for four years, but had been treated one month earlier while intoxicated. (R. at 43.) He also reported that he quit his job at Philip Morris, but medical records documented that Plaintiff had been fired due to drinking. (R. at 43.) Further, the ALJ noted "that a person's recollections are not as accurate with the passage of time, as the

documented records written during the period of treatment, especially when there is secondary gain involved." (R. at 43.)

The ALJ also summarized Plaintiff's heavy drinking and drug use that was present in his medical records. (R. at 43-44.) More specifically, Plaintiff tested positive for alcohol during most hospital visits and also tested positive on many occasions for benzodiazepine, barbiturates, opiates or marijuana. (R. at 44.) In October 2006, Plaintiff engaged in medication seeking behavior. (R. at 44.)

The ALJ noted that, although Plaintiff was diagnosed with depression in January 2004, he did not seek treatment until June 2005, despite having been hospitalized for withdrawal, intoxication and abdominal pain. (R. at 44.) In September 2004, Plaintiff's GAF was rated at 55. (R. at 44.) From June 2005 through December 2006, Plaintiff visited Dr. Schiff 17 times. (R. at 44.) The ALJ assessed that, soon after Plaintiff began his sessions, progress notes indicated that he was improving and his condition became stable. (R. at 44.) In February 2009, medical records indicated that Plaintiff's anxiety was controlled with medication. (R. at 45.)

On November 16, 2005, Dr. Schiff completed an RFC assessment and diagnosed Plaintiff with depression and alcohol dependence with a GAF rated at 54. (R. at 44.) Dr. Schiff marked that Plaintiff's impairments created moderate to moderately severe limitations in various work-related functions. (R. at 44.) The ALJ specifically noted that Dr. Schiff opined that Plaintiff's symptoms caused marked restrictions in ADLs, "moderate difficulties in maintaining social function, moderate deficiencies of concentration and attention and repeated episodes of decompensation in work or work-like settings." (R. at 44.) In March 2007, Dr. Schiff documented that Plaintiff was hospitalized a month earlier for alcohol dependence, discharged

without medications, was in control of his pain and became depressed when he thought of money problems. (R. at 44-45.)

The ALJ also summarized the opinions of Dr. May, who conducted a psychological consultative examination in October 2005. (R. at 45.) Dr. May diagnosed Plaintiff with alcohol dependence, anxiety disorder and major depression, and rated Plaintiff's GAF at 55. (R. at 45.) She also indicated that Plaintiff could perform simple, repetitive tasks and had the ability to interact with others, including co-workers and supervisors. (R. at 45.)

In March 2010, Plaintiff visited Dr. Newell for a consultative exam. (R. at 45.) Dr. Newell noted Plaintiff's history of alcoholism and chronic pancreatitis as well as Plaintiff's report that he had been sober since 2006. (R. at 45.) Dr. Newell diagnosed Plaintiff with depression and anxiety and recognized Plaintiff's feelings of sadness, poor sleep and motivation. (R. at 45.) The ALJ summarized Dr. Newell's examination, which indicated that Plaintiff was alert and oriented with a flat affect and dysphoric mood. (R. at 45.) Plaintiff was quiet and withdrawn. (R. at 45.)

The ALJ then summarized medical records from Dr. Bledowski from April 2009 through January 2010 that documented treatment for depression and generalized anxiety. (R. at 46.) Plaintiff admitted to his lifelong battle with alcoholism, but stated that he had been sober since March 2007 and attended AA meetings daily. (R. at 46.) He was diagnosed with depression and alcohol dependence in remission. (R. at 46.) Plaintiff was anxious over his finances and disability application; later he considered stopping his AA meetings, but decided to continue attending them. (R. at 46.) Throughout treatment, his GAF continued to be assessed at 55-65. (R. at 45.)

Plaintiff visited Dr. Fielding, a consultative psychologist, in July 2009. (R. at 46.) Plaintiff stated that he stopped drinking in February 2007 and rarely attended AA meetings. (R. at 46.) Dr. Fielding diagnosed Plaintiff with alcohol dependence in remission, major depressive disorder and anxiety disorder with some panic symptoms. (R. at 46.) Dr. Fielding assessed Plaintiff's GAF at 45 and noted that Plaintiff was self-medicating with alcohol. (R. at 46.) The ALJ summarized Dr. Fielding's opinions. (R. at 46.)

A week later, Dr. Fielding conducted an organicity examination and included mild dementia in Plaintiff's diagnoses. (R. at 46.) Dr. Fielding opined that Plaintiff could not function in a competitive work environment, because he scored in the lowest portion of the average range intellectually and below average in tests that involved pace, comprehension or abstract reasoning. (R. at 46.) Dr. Fielding believed that Plaintiff could not function at the same level as his same-aged peers and lacked focus, wandered off-topic, felt overwhelmed when processing information and demonstrated low memory scores. (R. at 46.)

The ALJ then summarized Dr. Khawaja's consultative report dated March 3, 2010, which indicated that Plaintiff was not seeking treatment for his mental health, because he was not insured. (R. at 47.) Plaintiff stated that he stopped drinking in 2006 and had a driver's license. (R. at 47.) He indicated that he was anxious since 2004 and was diagnosed with depression then. (R. at 47.) Plaintiff had problems with his comprehension and had a moderately depressed mood and a blunted affect. (R. at 47.) Dr. Khawaja noted Plaintiff's lethargy and methadone use. (R. at 47.) Plaintiff indicated that he heard voices at night and had passive suicidal ideation without a plan or intent. (R. at 47.) Dr. Khawaja diagnosed plaintiff with moderate, recurrent major depression with psychotic features and a history of alcohol abuse, while rating Plaintiff's GAF at

50. (R. at 47.) Dr. Khawaja noted that the information that he gathered from Plaintiff was limited. (R. at 47.) The ALJ summarized Dr. Khawaja's opinions. (R. at 47.)

The ALJ then assessed that Plaintiff was not fully credible. (R. at 47.) He also assigned Dr. Schiff's opinions very limited weight, because the opinions were not supported by objective medical evidence or consistent with substantial evidence, including his own treatment notes. (R. at 47-48.) The ALJ disputed Dr. Schiff's opinion that Plaintiff was markedly limited with ADLs; despite his assessment that Plaintiff's GAF was 54, many activities were no more than moderately severely limited and Plaintiff was independent in all ADLs. (R. at 47.) Dr. Newell's opinion was assigned some weight, because he only saw Plaintiff once. (R. at 48.) The ALJ assigned Dr. May's and Dr. Fielding's opinions some weight, because they only saw Plaintiff once and did not have the opportunity to review the entire record. (R. at 48.) Dr. Khawaja's opinion was given no weight, because it was rendered after the date last insured. (R. at 48.) The ALJ afforded the non-treating state agency psychologist appropriate weight, but not controlling weight. (R. at 48.)

Finally, the ALJ assessed that Plaintiff could participate in a variety of activities with only moderate limitations while drinking heavily and depressed. (R. at 48.) Continuing, the ALJ noted that "[w]ithin six months of beginning treatment his symptoms were absent, controlled." (R. at 48.) Plaintiff testified that he no longer drank. (R. at 48.) His GAF ranged between 45 and 65, with psychiatric problems resulting from being a caregiver of his mother. (R. at 49.)

At step four, the ALJ assessed that Plaintiff was unable to perform any past relevant work. (R. at 49.) Next, considering Plaintiff's age, high school education, ability to communicate in English, work experience and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 49-

50.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from October 27, 2004 through December 31, 2009. (R. at 50.)

## A. Substantial evidence supported the ALJ's assignment of weight to the medical opinions.

Plaintiff asserts that the ALJ erred when he assessed the opinions of Drs. Schiff, May, Fielding and Khawaja separately and argued that the ALJ should have reviewed their opinions together. (*See* Pl.'s Mem. at 10.) During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an

opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

### 1. The ALJ did not err when he assigned Dr. Schiff's opinions very limited weight.

In his decision, the ALJ assigned Dr. Schiff's opinions very limited weight, because the opinions were not supported by objective medical evidence or consistent with substantial evidence, including his own treatment notes. (R. at 47-48.) The ALJ disputed Dr. Schiff's opinion that Plaintiff was markedly limited with ADLs, despite his assessment that Plaintiff's GAF was 54, many activities were no more than moderately severe in limitations and Plaintiff was independent in all ADLs. (R. at 47.)

Plaintiff argues that Dr. Schiff's opinion should have been afforded controlling weight, as Dr. Schiff was Plaintiff's treating psychiatrist. (Pl.'s Br. at 14.) He asserts that objective evidence did support Dr. Schiff's opinion, the ALJ greatly mischaracterized Plaintiff's ADLs and Dr. Schiff's assignment of a GAF of 54 was merely the "highest degree of functioning" Plaintiff had over the course of the year leading up to the opinion. (Pl.'s Br. at 13-14.) The Commissioner explains that Dr. Schiff's treatment notes were inconsistent with his opinion, which therefore could not be assigned controlling weight. (Def.'s Mot. for S.J. and Mem. in Supp. ("Def.'s Mem.") at 13-15.)

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every

35

situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

Plaintiff visited Dr. Schiff from 2005 through 2007. Dr. Schiff's patient notes consisted mainly of checkmarks of various moods and appearances of Plaintiff. (*See* R. at 765.) On most visits, Dr. Schiff marked that Plaintiff was alert, oriented, coherent and goal directed. (R. at 759-62, 767, 973, 1182.) At times, Plaintiff appeared anxious. (R. at 762, 765, 973.) But, for the most part, Plaintiff had normal and appropriate appearance, attitude, mood, sleep, concentration, appetite or energy. (*See* R. at 759-62, 764-65, 969-70, 974, 1182.) On a few occasions, such as in June and July 2005 and December 2006, Dr. Schiff's notes were less optimistic and noted Plaintiff's mood swings, anxiety and alcohol dependency. (R. at 766-67, 969.)

Despite Dr. Schiff's patient notes that contained mainly positive markings, on November 16, 2005, Dr. Schiff completed a Mental RFC Assessment that indicated that Plaintiff was moderately or moderately severely limited in all areas. (R. at 755-57.) Dr. Schiff marked that Plaintiff's symptoms included sleep disturbance, personality change, mood disturbance, difficulty thinking and decreased energy. (R. at 758.) These symptoms were contradicted by Dr. Schiff's markings on his patient notes, however, which indicated that Plaintiff's sleep, mood, attitude, concentration and energy were, for the most part, normal and appropriate throughout treatment sessions. (*See* R. at 759-65, 969-70, 974-75, 1182.)

In his opinion, Dr. Schiff assessed Plaintiff's GAF at 54, but indicated that Plaintiff was disabled as of October 1, 2004. (R. at 756, 758.) While Plaintiff asserts this was merely the

36

"highest degree of functioning" that Plaintiff had over the course of a year, the GAF score is supported by Dr. Schiff's treatment notes, which observed normal and appropriate sleep, mood, attitude, concentration and energy. *See DSM-IV* at 34 (defining a GAF of 51-60 as "[m]oderate symptoms"). (*See also* R. at 759-65, 969-70, 974-75, 1182.)

Thus ALJ characterized Plaintiff's ADLs as including the ability to take care of his personal needs, prepare simple meals, drive, shop, watch television, care for his cat, visit and play cards with family and friends, maintain his car (with assistance) and go to restaurants. (R. at 42.) In a Function Report, Plaintiff indicated that he took care of his animals and the house. (R. at 93.) Plaintiff noted that he prepared simple meals, cleaned, laundered, ironed, drove, shopped, read, watched television, talked on the phone, emailed and visited doctors. (R. at 94-96.) He also marked in a Daily Activities Questionnaire that he could wash dishes, make his bed, launder, sweep, write, play cards, vacuum, cook simple meals, grocery shop, visit restaurants, visit family, check oil in his car and pay bills, in most cases with difficulty or help. (R. at 119-23.) At the first hearing, Plaintiff testified that he helped with the shopping, cooking and cleaning. (R. at 1779.) Plaintiff read, cared for his cat and attended AA meetings as well as church. (R. at 1780.) He did not need help attending to his personal hygiene. (R. at 1780-81.) The ALJ did not greatly mischaracterize Plaintiff's own statements and testimony pertaining to his ADLs.

While Dr. Schiff was Plaintiff's treating psychiatrist, his opinion could not be afforded controlling weight, because it was not supported by substantial evidence in the record, mainly, the objective evidence contained in Dr. Schiff's own treatment notes. *Craig*, 76 F.3d at 590 ("circuit precedent does not require that a treating physician's testimony 'be given controlling weight'") (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). The Fourth Circuit has

consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2). As such, the ALJ did not err when he assigned Dr. Schiff's opinions very limited weight.

### 2. The ALJ did not err when he assigned Dr. May's opinion some weight.

The ALJ assigned Dr. May's opinions some weight, because she only saw Plaintiff once and did not have the opportunity to review the entire record. (R. at 48.) Plaintiff contends that Dr. May's "opinions are remarkably similar to those of Dr. Schiff." (Pl.'s Mem. at 15.) Further, Plaintiff complains that the ALJ did not summarize fully her opinion in his decision and that the ALJ should have reviewed the record as a whole and assigned Dr. May's opinions the appropriate weight. (Pl.'s Mem. at 15-16.) The Commissioner argues that Dr. May's opinions were not supported by treating source records and that the ALJ could assign the opinion less weight based on the amount of times that Dr. May saw Plaintiff. (Def.'s Mem. at 15-17.)

Dr. May examined Plaintiff on October 18, 2005. (R. at 750.) Dr. May opined that Plaintiff could understand and perform simple, repetitive tasks while sober. (R. at 752.) If he could maintain sobriety, he should be able to return to his former employment. (R. at 753.) Plaintiff should be able to interact with supervisors, coworkers and the public. (R. at 752.) However, he would likely decompensate under the stress of competitive work. (R. at 752.) Dr. May assessed Plaintiff's GAF at 55. (R. at 753.)

Two of the factors that an ALJ must consider when evaluating the opinion evidence are the frequency of examinations and the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed. *Hines*, 453 F.3d at

563. Dr. May performed a single consultative examination on Plaintiff. According to *Hines*, this must be considered when assessing opinion evidence. Similarly, because Dr. May's opinion was provided in 2005, she did not have the opportunity to review and comment on two additional years of medical evidence. Therefore, assigning this opinion "some weight" over the entire time period of Plaintiff's alleged disability was not error.

Plaintiff asserts that Dr. May's opinion is substantially similar to Dr. Schiff's opinion. And as explained above, substantial evidence did not support the opinion of Dr. Schiff. Therefore, an assignment of some weight to Dr. May's opinion was not improper.

### 3.     The ALJ did not err when he assigned Dr. Fielding's opinion some weight.

The ALJ assigned Dr. Fielding's opinion some weight, because he only saw Plaintiff once and did not have the opportunity to review the entire record. (R. at 48.) Plaintiff argues that Dr. Fielding's opinion was consistent with the opinions of Drs. May and Schiff. (Pl.'s Mem. at 16.) He also notes that Dr. Fielding had the opportunity to review more of the record than Dr. May. (Pl.'s Mem. at 16-17.) The Commissioner argues that Dr. Fielding's opinion was not supported by treating source records and that the ALJ could assign the opinion less weight based on the number of times that Dr. Fielding saw Plaintiff. (Def.'s Mem. at 15-17.)

On July 16, 2009, Plaintiff visited Dr. Fielding for a consultative examination. (R. at 1729.) Dr. Fielding found Plaintiff credible and determined that Plaintiff's prognosis was guarded due to his history with alcohol. (R. at 1734, 1743.) He noted Plaintiff's severe psychosocial stressors, which included his medical history, substance abuse, loss of a job, loss of income and chronic pain. (R. at 1735.) Dr. Fielding assessed that Plaintiff had fair adaptive functioning and a GAF of 45. (R. at 1735.) Dr. Fielding also remarked that he was surprised that Plaintiff had abstained from alcohol for two years "given the severity of his condition" and

that Plaintiff felt his depression and anxiety were "out of control" now that he was no longer self-medicating. (R. at 1735.)

Dr. Fielding opined that Plaintiff would have difficulty acquiring and using information, completing detailed and complex tasks, performing simple and repetitive tasks over a sustained period of time, maintaining regular attendance in a workplace until he was more stable, completing a normal workday or workweek, and accepting and carrying out instructions on a consistent basis. (R. at 1736.) Plaintiff did not have any desire to interact with people. (R. at 1736.) Dr. Fielding opined that, because he could not deal with stress well, he would have a difficult time in a competitive work environment. (R. at 1737.)

Plaintiff is correct in his assertion that Dr. Fielding's opinion was substantially similar to Dr. Schiff's opinion. And as explained above, substantial evidence did not support that opinion. In addition to being inconsistent with Dr. Schiff's patient notes, Dr. Fielding's opinion was also inconsistent with Dr. Bledowski's patient notes. For example, Dr. Bledowski routinely rated Plaintiff's GAF at a 55-65, a full five to 15 points higher than Dr. Fielding.[12] (*See* R. at 1618-22.) Finally, and as explained above for Dr. May's opinions, the factors considered to assess opinion evidence includes the type and frequency of the examination. *Hines*, 453 F.3d at 563. Additionally, assigning weight based on the records available is not error. Assigning this opinion "some weight" over the entire time period of Plaintiff's alleged disability is not error.

### 4. The ALJ did not err when he assigned Dr. Khawaja's opinion no weight.

Dr. Khawaja's opinion was given no weight, because it was rendered after the date last insured. (R. at 48.) Citing *Christian v. Astrue*, 1:06cv84, 2007 WL 1378524 (W.D. Va. May 9,

---

[12] Although Plaintiff in his Reply Brief attempts to discredit Dr. Bledowski's GAF ratings, (Pl.'s Rep. to Def.'s Mot. for S.J. and Br. in Supp. (ECF No. 11) at 6-15), Dr. Bledowski's assignment of Plaintiff's GAF scores are consistent with his treatment notes. *Compare DSM-IV* at 34 *with* (R. at 1618-22).

2007), Plaintiff argues that evidence obtained after the date last insured can and should be considered. (Pl.'s Mem. at 18.) The Commissioner, citing *Yost v. Barnhart*, 79 Fed. Appx. 553, 555 (4th Cir. 2003), asserts that the opinion evidence can be rejected, because it was rendered after the date last insured. (Def.'s Mem. at 18.)

Plaintiff's date last insured was December 31, 2009. (R. at 39.) Plaintiff visited Dr. Khawaja on March 3, 2010. (R. at 1273.) He was assessed a GAF of 50. (R. at 1278.) Plaintiff's prognosis was poor without mental health counseling. (R. at 1279.)

Dr. Khawaja opined that Plaintiff was not able to manage his finances due to depression, anxiety, lethargy and his psychomotor problems. (R. at 1279.) Plaintiff could not perform complex and detailed tasks on a consistent basis, could not perform simple tasks, could not maintain regular attendance, could not perform work activities on a consistent basis or without special or additional supervision, could not complete a normal workday or workweek without interruptions, could accept instructions from supervisors, could interact with the public and could not deal with the usual stressors encountered in competitive work. (R. at 1279-80.)

The ALJ did not err when he assigned Dr. Khawaja's opinion no weight, because it was rendered over two months after Plaintiff's date last insured. *See Yost*, 79 Fed. Appx. at 555 ("Dr. Massenburg's opinion was rendered . . . nearly four months after the date Yost was last insured. Thus, it is not relevant to a disability determination for DIB purposes."); T*ynes v. Commissioner of Social Sec.*, 4:10cv146, 2011 WL 6981194, at *8 (E.D. Va. Dec. 12, 2011) (holding that an opinion completed four years after plaintiff's date last insured with no indication that the opinion pertained to plaintiff's capabilities during his insurance period could be assigned minimal weight). Unlike the purely objective MRI evidence that revealed brain lesions dated after plaintiff's date last insured that Plaintiff cites to in *Christian*, 2007 WL 1378524, at *6, Dr.

Khawaja's opinion evidence contained summaries of both subjective and objective medical evidence. The subjective evidence was, for the most part, evidence of Plaintiff's current mental state — after his date last insured.

Plaintiff explains that Dr. Khawaja's opinion was consistent with the opinions of Drs. Schiff, May and Fielding. (Pl.'s Mem. at 18.) However, as explained above, the opinions of Drs. Schiff and Fielding were not supported by substantial evidence in the record and Dr. May's opinion was rendered in October 2005, almost five years before Dr. Khawaja's opinion. Thus, even if the ALJ erred at all in his rationale for assigning Dr. Khawaja's opinion no weight, the error was harmless, as substantial evidence nonetheless supported the ALJ's assignment of weight.

**B.      Substantial evidence supported the ALJ's evaluation of Plaintiff's credibility.**

Plaintiff takes umbrage with the ALJ's questioning of the veracity of Plaintiff's statements. (Pl.'s Mem. at 23-24.) He characterizes Plaintiff's inconsistent statements as minor misstatements and urges the Court to assess him as credible based on his long work record. (Pl.'s Mem. at 23-26.) Next, Plaintiff asserts that the ALJ mischaracterized his ADLs to discredit his statements of limitation. (Pl.'s Mem. at 26-29.) Finally, Plaintiff explains that Dr. Fielding's GAF score should be considered in context with the other scores. (Pl.'s Mem. at 30.) The Commissioner argues that the record is replete with contradictory statements from Plaintiff, that Plaintiff could care for his ailing mother and that Plaintiff maintained a GAF of 55-65 while sober. (Def. Mem. at 19-23.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the symptoms claimed, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of those symptoms and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms; the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Plaintiff's inconsistent statements are littered throughout the record. While Plaintiff worked for well over 15 years at Philip Morris (R. at 78, 635, 1768), he indicated that he stopped working in October 2004, because he could no longer perform the job. (R. at 78). Plaintiff also told Dr. Fielding that he quit his job at Philip Morris and received $170,000 from a profit sharing plan in 2004, but that money had been spent. (R. at 1731.) However, medical records documented that Plaintiff was fired due to excessive absenteeism as a result of his alcohol abuse.

(*See* R. at 684, 712.) In fact, as early as October 2003, Plaintiff admitted to having problems at work and the possibility of being fired. (R. at 657.) Even Dr. Khawaja noted that, contrary to medical records, Plaintiff clearly stated that he did not lose his job due to alcohol-related problems. (R. at 1276.)

Additionally, on October 18, 2005, Plaintiff visited Dr. May and admitted to having consumed 18 beers a day and/or a fifth of liquor, but claimed his last use of alcohol was in September 2005. (R. at 750.) However, Plaintiff had visited the hospital one day earlier, complaining of pancreatitis as a result of a three-day alcohol binge the previous week. (R. at 906.) As the Commissioner highlighted at oral argument, this lie not only discredits Plaintiff, but it also discredits medical reports based upon Plaintiff's lies.

Next, the ALJ characterized Plaintiff's ADLs as including the ability to take care of his personal needs, prepare simple meals, drive, shop, watch television, care for his cat, visit and play cards with family and friends, maintain his car (with assistance) and go to restaurants. (R. at 42.) In a Function Report, Plaintiff indicated that he took care of his animals and the house. (R. at 93.) Plaintiff noted that he prepared simple meals, cleaned, laundered, ironed, drove, shopped, read, watched television, talked on the phone, emailed and visited doctors. (R. at 94-96.) He also marked in a Daily Activities Questionnaire that he could wash dishes, make his bed, launder, sweep, write, play cards, vacuum, cook simple meals, grocery shop, visit restaurants, visit family, check oil in his car and pay bills, in most cases with difficulty or help. (R. at 119-23.)

At the first hearing, Plaintiff testified that he helped with the shopping, cooking and cleaning. (R. at 1779.) Plaintiff read, cared for his cat and attended AA meetings as well as church. (R. at 1780.) He did not need help attending to his personal hygiene. (R. at 1780-81.)

In fact, not only could Plaintiff care for himself, but he also cared for his mother. (*See* R. at 1597, 1600-06, 1609.) The ALJ did not greatly mischaracterize Plaintiff's own statements and testimony pertaining to his ADLs and appropriately took Plaintiff's ADLs into account when assessing his credibility.

Finally, Dr. Fielding's assignment of Plaintiff's GAF was inconsistent with Dr. Bledowski's patient notes. During that same period, Dr. Bledowski routinely rated Plaintiff's GAF at a 55-65, a full five to 15 points higher than Dr. Fielding. (*See* R. at 1618-22, 1735.) As explained above, substantial evidence did not exist in the record to support Dr. Fielding's GAF assessment.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Substantial evidence existed in the record to support the ALJ's credibility determination.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: October 15, 2012